1
2
3
4
5

Julie Pollock (SBN 346081)
**BERGER MONTAGUE PC**
505 Montgomery St, Suite 625
San Francisco, CA 94111
Tel: (415) 906-0684
Fax: (215) 875-4604
jpollock@bm.net

6

*Attorneys for Plaintiff*

7

8

9

10

11

12

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 13 FELICIA ROBINSON, individually and on behalf of those similarly situated, | CASE NO. 24-cv-1784 |
| 14 Plaintiff, | **CLASS ACTION COMPLAINT FOR** |
| 15 v. | **DAMAGES** |
| 16 BLST OPERATING COMPANY, LLC | (1) Violations of the Fair Credit Reporting Act |
| 17 D/B/A FINGERHUT, | (2) Violations of the California Consumer Credit Reporting Agencies Act |
| 18 Defendant. | (3) Violations of the California Unfair Competition Law |
| 19 | |
| 20 | **DEMAND FOR JURY TRIAL** |

21

22

23

24

25

26

27

28

COMPLAINT

**PRELIMINARY STATEMENT**

1.      This consumer class action is brought under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), the California Consumer Credit Reporting Agencies Act ("CCRAA), Cal. Civ. Code § 1785.1, *et seq.*, and the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, against Defendant BLST Operating Company, LLC d/b/a Fingerhut ("Fingerhut" or "Defendant").

2.      Fingerhut is a mail order/online retailer that markets itself to people with poor or no credit histories.

3.      Fingerhut encourages its customers to buy products from Fingerhut with Fingerhut's credit accounts in order to build a credit history.

4.      Fingerhut tells its customers that using Fingerhut will allow a consumer to "build your credit history when you make a purchase and pay your monthly bill" and "build a better credit future."

5.      On April 12, 2022, however, Fingerhut opened thousands of new accounts for consumers without permission, damaging the credit ratings of its customers in the process.

6.      Without permission from its customers, Fingerhut closed its customers' "Fingerhut Advantage" accounts and opened new "Fingerhut Fetti" accounts in their names, without their permission.

7.      Fingerhut stated that it was "required" to issue a "new credit account" "because [Fingerhut's] agreement with [Fingerhut's] current financing partner is ending."

8.      Fingerhut explained that this was a "business formality" and "not because of anything customers did."

9.      For the most part, the Fingerhut Fetti accounts had the same credit line amounts as the prior Fingerhut Advantage accounts.

10.      Starting on April 12, 2022, new purchases could not be made with the Fingerhut Advantage accounts and the accounts were closed or left open only for collections purposes.

11.     Fingerhut opened Fingerhut Fetti accounts for people who had not made a transaction with Fingerhut in many years.

12.     Despite the fact that the Fingerhut Fetti accounts were essentially continuations of the Fingerhut Advantage accounts and opened without permission or authorization, Fingerhut reported the Fingerhut Fetti accounts as new and separate tradelines from the Fingerhut Advantage accounts to the credit bureaus.  Fingerhut has reported the account opening dates as April 12, 2022.

13.     This reporting was false.  It is inaccurate to report an account for a consumer that the consumer never agreed to open.  And at a minimum, the date opened for the Fingerhut Fetti account should be same date that the Fingerhut Advantage accounts were opened.

14.     These actions harmed consumers' credit.  Credit scores are determined in part by how many open accounts a consumer may have and how long active credit accounts have been open.

15.     By opening new accounts (without permission) and reporting such to the credit bureaus, Fingerhut damaged credit scores as opening a new line of credit causes credit scores to drop.

16.     The CCRAA provides that "[a] person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate."  Cal. Civil Code § 1785.25(a).

17.     The FCRA further requires that any furnisher who receives a dispute from a consumer reporting agency regarding a tradeline must "conduct an investigation with respect to the disputed information" and correct any incomplete or inaccurate information.  15 U.S.C. § 1681s-2(b).

18.     Fingerhut has completely failed in these duties, refusing to correct reporting of an account that Fingerhut knew it had no permission to open.

19.     Plaintiff, on behalf of herself, and those similarly situated, thus brings this class action complaint against Fingerhut seeking damages and other relief.

**PARTIES**

20.    Plaintiff Felicia Lum Robinson is a natural person who at all relevant times resided in San Leandro, California and is a "consumer" protected by the FCRA and CCRAA.

21.    Defendant BLST Operating Company, LLC[1] d/b/a Fingerhut is headquartered in Eden Prairie, Minnesota.  Fingerhut touts itself as "the leading provider for middle-income consumers seeking to establish build or rebuild credit through an independent bank partnership, offering qualifying customers revolving credit and installment loans with monthly payment options and the flexibility of paying over time."[2]

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over this action pursuant to 15 U.S.C § 1681p, 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). Jurisdiction is also appropriate under the Class Action Fairness Act, 28 U.S.C. § 1332(d) because at least one class member is a citizen of a different state than Defendant.

23.    The Court has personal jurisdiction over Defendant because Defendant conducts business in this District, including opening unlawful accounts and engaging in inaccurate reporting on Plaintiff and other residents in this District.

24.    Venue is proper under 28 U.S.C. § 1391(b).

25.    **Divisional Assignment.**  Per Civil L.R. 3.2(d), it is appropriate to assign this case to the San Francisco or Oakland Division because the action arises from events in Alameda County.

---

[1] BLST Operating Company, LLC's associated company, BLST Acquisition Company LLC was the purchaser of Bluestem Brands, Inc.'s assets in a recent bankruptcy matter, *In re: Bluestem Brands, Inc.*, No. 20-10566-MFW (Bkrptcy. D. De.), including Fingerhut.
[2] https://www.bluestem.com/our-brands/fingerhut/ (last visited Jan. 30, 2024)./

COMPLAINT

**FACTS**

I.    **Background on Fingerhut and Credit Scoring**

26.    Fingerhut markets itself to consumers "looking to establish, build or rebuild credit."[3]  The company encourages consumers to "start your credit journey with us" and "build a better credit future."[4]

27.    Fingerhut touts that it reports to the credit bureaus stating: "When you use your WebBank/Fingerhut Credit Account, and you make your payments on time, you build your buying power with us, and we report your payment history to the credit bureaus."[5]

28.    A credit score is a score generated by applying a scoring algorithm to the information contained in a credit report.  The credit scoring industry is dominated by the Fair Isaac Corporation ("FICO").  Most FICO scores are on a scale from 300–850.

29.    Credit scores greatly impact both whether lenders will offer credit and the terms on which they will offer credit.  Consumers with higher credit scores receive higher credit limits at lower interest rates.

30.    Fingerhut's marketing is centered around improving people's credit.  For example, Fingerhut states that completion of the Fingerhut FreshStart program can lead to "a 30 point increase on [a consumer's] FICO score."[6]

31.    FICO scores are the predominant scores used by lenders.  FICO has released guidance about what can affect consumers' credit scores.

32.    FICO scores take into account the following:

- 35% Payment history

- 30% Outstanding debt

- 15% Credit history length

- 10% New Credit

[3] https://www.fingerhut.com/ (last visited Jan. 30, 2024).
[4] https://www.fingerhut.com/ (last visited Jan. 30, 2024).
[5] https://www.fingerhut.com/content/ourstory (last visited Jan. 30, 2024).
[6] https://www.facebook.com/Fingerhut/videos/36972848513272/ (last visited Jan. 30, 2024).

COMPLAINT

- 10% Credit mix[7]

33.     The older the average age of someone's credit accounts is, the higher the credit score will be.  Opening a new account can have a significant effect on one's credit score.  As explained by FICO:

> New accounts will lower your average account age, which will have a larger effect on your FICO Scores if you don't have a lot of other credit information. Even if you have used credit for a long time, opening a new account can still lower your FICO Scores.[8]

34.     Further, a new credit account will shorten the length of credit history.  Per FICO:

> A new credit card or line of credit will also affect your length of credit history. This part of your score is made up of your "oldest" account and the average of all your accounts. Opening new credit lowers the average age of your total accounts. This, in effect, lowers your length of credit history and subsequently, your credit score.[9]

35.     FICO thus advises that consumers should "carefully consider if you need a new credit account."[10]  This is especially true if the consumer is considering a large loan in the near future, such as a mortgage.

36.     Fingerhut also cautions consumers about closing old accounts and that such closure can damage a person's credit score:

> If you have a credit card you don't use, closing it is unlikely to improve your credit score. It's possible that it may actually lower it. That's because it may change your credit utilization rate. Your credit utilization rate is a calculation credit-scoring companies use to measure how much of your total revolving credit limits are being used.  When you close an unused account, you reduce your total revolving credit limits, so your credit utilization goes up. Of course, if an unused card creates a temptation to spend, you may be better off in the long run by closing the account.[11]

---

[7] https://www.myfico.com/credit-education/whats-in-your-credit-score (last visited Jan. 30, 2024).
[8] https://www.myfico.com/credit-education/credit-scores/new-credit (last visited Jan. 30, 2024).
[9] https://www.myfico.com/credit-education/credit-scores/new-credit (last visited Jan. 30, 2024).
[10] https://www.myfico.com/credit-education/credit-scores/new-credit (last visited Jan. 30, 2024).
[11] https://blog.fingerhut.com/top-eight-myths-about-your-credit-score/ (last visited Jan. 30, 2024).

37.     Fingerhut acknowledges that having a long credit history will help credit scores: "Keep unused credit accounts open unless annual fees cost you too much. Your credit history and scores benefit from a long credit history and higher total credit limit."[12]

38.     Fingerhut further advises: "If you don't use old accounts, don't close them – your credit score may benefit from having a longer credit history."[13]

39.     The credit reporting industry has taken steps to ensure that people with long-standing accounts do not suffer a drop in score when an account is transferred.  The so-called "Big 3" credit bureaus Experian, Equifax, and Trans Union receive information to include on credit reports from creditors, like Fingerhut, using an electronic data input format called "Metro 2."

40.     The Consumer Data Industry Association publishes guidance on how to report using the Metro 2 format.  This guidance is called the "Credit Resource Reporting Guide" ("CRRG").

41.     One piece of information that creditors provide to the credit bureaus is the date an account was originally opened, known as the "Date Opened" field.  The CRRG advises data furnishers that the original "Date Opened" for a credit account should be retained "regardless of future activity, such as transfer, refinance, lost or stolen card, etc."

42.     Thus, it is a typical practice in the credit industry that when an account is transferred or transitioned, the creditors will report a single account with an integrated payment history and a Date Opened of when the initial account was first opened.

II.     **Fingerhut Opens Accounts Without Permission**

43.     In March 2022, Fingerhut sent an advisory out to its customers informing them that due to a change in Fingerhut's financing partner, Fingerhut customers could no longer use their

_____

[12] https://www.fingerhut.com/content/8-tips-for-building-or-rebuilding-credit (last visited Jan. 30, 2024).
[13] https://www.fingerhut.com/content/3-tips-for-improving-your-credit-score (last visited Jan. 30, 2024).

COMPLAINT

"Fingerhut Advantage" accounts, and instead would have their accounts "transitioned" to a "Fingerhut Fetti" account.

44.    Per Fingerhut, these Fingerhut Fetti accounts "were automatically created for customers in good standing as a business formality."

45.    Fingerhut closed the Fingerhut Advantage accounts because its "contract with [Fingerhut's] financing partner ended" or "expired."

46.    The Fingerhut Fetti accounts had the same credit limit as the Fingerhut Advantage accounts and had the same 10-digit customer numbers.  Per Fingerhut, the Fingerhut Fetti account was designed to "offer you the same benefits as you had with your Fingerhut Advantage credit account."

47.    Despite the obvious harm to consumer credit in closing an old account and opening a new account with a newer account opening date, Fingerhut told consumers on its website that opening a new account will help consumer credit scores: "Opening a credit account typically boosts the account holders' credit score. This is because you now have two tradelines reporting to the bureaus."

48.    This statement was false.  Fingerhut's actions did not boost the account holders' credit scores.

49.    And contrary to other statements made on Fingerhut's website, Fingerhut also told consumers that "People sometimes think closing an account takes away from a person's credit history and hurts their FICO® Score, but that's not true. Your FICO Score looks at the length of both open and closed accounts. Closed accounts will be a part of your credit history on your credit report for many years."

50.    This statement was misleading because it failed to acknowledge the impact of the new account on average account age.

51.    After Fingerhut opened the Fetti accounts, it began reporting two separate tradelines to each of the three National Consumer Reporting Agencies—Equifax, Experian and Transunion.  Fingerhut reported one tradeline for the Fingerhut Advantage account and a second

7

COMPLAINT

tradeline for the Fingerhut Fetti account.  The Fingerhut Fetti account was reported with a date opened of April 12, 2022.

52.  This reporting was inaccurate.  Consumers had not authorized Fingerhut to authorize the opening of a new credit account.  Thus it was inaccurate to report the Fingerhut Fetti account when the consumer had never authorized the opening of the account.

53.  Alternatively, the Fingerhut Fetti accounts should have indicated that the accounts were a continuation of the prior Fingerhut Advantage accounts and reported a "Date Opened" with the same date as the Fingerhut Advantage accounts.

54.  Fingerhut has received multiple direct disputes about the reporting of the Fingerhut Fetti accounts but have failed to change the reporting.  For example, in July 2022, a consumer and putative class member named Brian Gross submitted the following dispute to Equifax, Experian, and TransUnion, which then pursuant to 15 U.S.C. § 1681i(a)(2)(A), forwarded the dispute to Fingerhut:

> I am writing to dispute my credit report. I have had an account with Fingerhut since October 17, 2011. In March 2022, Fingerhut apparently transitioned my account to a WebBank/Fingerhut Fetti Credit Account. I did not request or control any aspect of this transition and can no longer use my prior account. There are now two Fingerhut accounts showing on my credit report.
>
> The Fingerhut Fetti account inaccurately states that the date opened for the account is March 22, 2022. This is incorrect. I did not open a new account with Fingerhut in March 2022. The date opened should be October 17, 2011. I am concerned that having a recently opened account will affect my credit score. I am disputing the date opened for the Fingerhut Fetti account.
>
> From what I understand, it appears that Fingerhut transitioned many accounts to a Fingerhut Fetti account in March 2022. I don't think that the inaccuracy in my report is an isolated incident. I am therefore requesting that all reporting of Fingerhut Fetti accounts be reinvestigated and corrected.

55.  Fingerhut has received similar disputes, including from Plaintiff.

56.  Fingerhut did not engage in any reasonable reinvestigation of these disputes. Indeed, in August 2022, Fingerhut informed Mr. Gross that his credit file would not be changed.

8
COMPLAINT

The Fingerhut Fetti accounts were neither removed and the date opened on the accounts was not changed to the date that the Fingerhut Advantage accounts were opened.

57.    Instead, in response to Mr. Gross' dispute, Fingerhut provided a response, that stated among other things:

> We were required to close your account as the contract with our financing partner expired. While our preference would have to been to maintain these long-standing Advantage accounts for our customers, it was not a choice we could control. We came to an agreement with the financing group to continue to service our valued customers on their Advantage accounts.

58.    This statement was false. Fingerhut could have, but chose not to, correct its reporting.

59.    Fingerhut's response also admitted the negative credit reporting consequences of its actions:

> We understand that this change has brought about some concerns for you. And we know that some of the recent changes we had to make to our accounts may have had a negative impact on your credit report. The new Fetti account was created so we did not disrupt your ability to use the credit option. The closure of the old account and opening of the new account can temporarily lower your score. A history of on-time payments over time will have a positive impact to your credit score.

60.    Fingerhut's response further stated: "We cannot revise the information we are reporting to the credit bureaus as we are required to furnish accurate reporting."

61.    This was also false. Fingerhut could have, indeed was required, to correct its statements.

62.    Fingerhut's unlawful conduct affected thousands of consumers. A small sample of comments that can be found online are as follows:

- Hello I logged in and saw the finger hut fetti account I never applied for this and it dropped my credit score 45 points when Im in the middle of applying for a Mortgage, I didnt authorize any new accounts so Im confused what happened and

9

COMPLAINT

why it dropped my score the only new activity on my credit account was from finger hut, thats why Im confused since I havent bought anything or applied for anything.[14]

- I just got this email as well If you read the FAQ on the site about the new fetti account, It will be reported as a new trade line. I'm currently looking into cancelling mine before the change, I Cannot have a new account hit right now, would rather take the 2k hit of available credit.[15]

- If the new account would have the old account age then it is worth it. If new account is going to show up as a new account started today and  If it is going to change Average Account Age then need to reconsider.[16]

- I got the same disappointing email. Fingerhut was my first unsecured line of credit, and an important part of my credit rebuild. I was going to keep it open for another year or so, even though I've moved up to better cards, but not at the cost of opening a new tradeline with them. If I'm going to suffer the new account penalty, it's going to be for a better card than a (second) Fingerhut account. Unfortunately this is going to hit me at an awkward time, as I have a small credit builder loan that I just finished paying off, and I hate to have 2/3 of my oldest tradelines close at the same time.[17]

- I called today, they closed the account but refused to remove it from my reports saying they notified me in a letter by mail that the new account would be opened. i explained the letter didnt explain that a new account without my prior history without my permission. i stated i did not give them permission to open a new

[14] https://www.reddit.com/r/CRedit/comments/ucpw8j/fingerhut_messed_up_my_credit_score_by_opening_a/ (last visited Jan. 30, 2024).
[15] https://ficoforums.myfico.com/t5/Credit-Cards/FingerHut-Credit-Card/td-p/6497871 (last visited Jan. 30, 2024).
[16] Id.
[17] Id.

COMPLAINT

account in my name. their answer, tough cookies, if you want it removed from your reports you will have to try it yourself.[18]

### III.    Plaintiff's Experience

63.    Plaintiff Felicia Lum Robinson opened a Fingerhut Advantage account in or around March 2019.  Plaintiff kept her Fingerhut Advantage account in good standing and made her payments on time.

64.    Prior to opening her Fingerhut account, Plaintiff believed that opening a Fingerhut account would improve her credit based on Fingerhut's marketing.

65.    In or around April 2022, Fingerhut opened a new Fetti account for Plaintiff without her permission.  Fingerhut reported the new account to the credit bureaus as a separate tradeline with an account opening date in April 2022.

66.    The Fingerhut Fetti account has the same credit limit as the Fingerhut Advantage account.

67.    Plaintiff never used her Fingerhut Fetti account.

68.    Plaintiff would have never opened a Fingerhut account had she known that Fingerhut would open an account with her permission and harm her credit.

69.    In February 2022, Plaintiff disputed Fingerhut's reporting directly to the credit bureaus who then forwarded Plaintiff's dispute to Fingerhut.

70.    Fingerhut did not change its reporting in response to Plaintiff's dispute.

71.    As a result of Fingerhut's false reporting, TransUnion issued inaccurate reports on Plaintiff to, among others, Geico in May 2022, Mutual of Omaha in July 2022, Capital One Auto Finance in June and July 2022, Elevate 1 Financial, LLC in October 2023, and T-Mobile in November 2023.

72.    As a result of Fingerhut's false reporting, Equifax issued inaccurate reports on Plaintiff to, among others, to Capital One Auto Finance in April 2022, to Citibank in October

---

[18] *Id.*

2022, Capital One in October 2022, and Comenity Capital/Petco in October 2023.

73.    As a result of Fingerhut's false reporting, Experian issued inaccurate reports on Plaintiff to, among others, Patelco Credit Union in May 2022, Capital One NA in May 2022, and Discover Financial Services in September 2022 and September 2023.

74.    Defendant's inaccurate reporting has falsely portrayed Plaintiff as opening an account that never opened, inaccurately portrayed her credit history, and caused her anxiety, worry, and frustration about the information being disseminated to her potential creditors.

## CLASS ALLEGATIONS

75.    Plaintiff asserts her claims on behalf of the Class defined below pursuant to Fed. R. Civ. P. 23:

> All individuals in California for whom Defendant automatically transitioned Fingerhut Advantage accounts to Fingerhut Fetti accounts.

76.    The Class members are so numerous that joinder of all is impractical.  The names and addresses are identifiable through documents maintained by Defendant, and they may be notified of the pendency of this action by published and/or mailed notice.

77.    Plaintiff's claims are typical of the claims of each Class member.  The violations suffered by Plaintiff are typical of those suffered by other putative class members, and Defendant treated the Plaintiff consistently with other putative Class members in accordance with their standard policies and practices.

78.    Plaintiff is an adequate representative of the Class because her interests coincide with, and are not antagonistic to, the interests of the members of the Class she seeks to represent, she has retained counsel competent and experienced in such litigation, and she intends to prosecute this action vigorously.  Plaintiff and her Counsel will fairly and adequately protect the interests of members of the Class.

79.    Common questions of law and fact exist as to all members of the Class.  Without limitation, the total focus of the litigation will be Defendant's uniform conduct and procedures, and whether Defendant violated California law and the FCRA are common questions that can be

answered with common proof.

80.     Class certification is also appropriate under for equitable or injunctive relief because Defendant has acted or refused to act on grounds that apply generally to the Class such that final injunctive relief is appropriate respecting the Class as a whole.

81.     Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations the FCRA and California law.  Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution.  Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices.  Moreover, management of this action as a class action will not present any likely difficulties.  In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

82.     The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

## CAUSES OF ACTION
### COUNT I
### VIOLATION OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)

83.     Plaintiff realleges and incorporates the allegations set forth in the paragraphs above.

84.     Defendant violated 15 U.S.C. § 1681s-2(b) by failing to fully and properly investigate disputes of inaccurate representations regarding the Fingerhut Fetti account, including by reporting it as a different tradeline than the Fingerhut Advantage account, reporting it with a Date Opened in April 2022, and failing to note that the accounts were opened without permission.

13

COMPLAINT

85.     Fingerhut has been repeatedly notified through disputes received from the credit bureaus (including from Plaintiff) that its reporting is inaccurate, yet it has failed to correct its reporting or conduct any reasonable investigation into its reporting.

86.     Defendant failed to review all relevant information regarding the Fingerhut Fetti account and failed to abide by credit reporting guidelines.

87.     As a result of Defendant's conduct, Plaintiff and Class members suffered harm to their credit, their reputations, lost time disputing and trying to correct the inaccurate reporting; and distress.

88.     Defendant's conduct was willful under 15 U.S.C. § 1681n and contrary to industry guidance.  Defendant falsely represented that Plaintiff and thousands of other consumers had opened new credit accounts in April 2022.

89.     Defendant knew that its actions would harm consumers' credit prospects and would result in false information being disseminated about consumers to third parties.

90.     Defendant failed to reasonably reinvestigate its uniform credit reporting practices in light of Plaintiff's dispute.

91.     In addition to conduct set forth above in this complaint, Defendant's willful conduct is evidenced by, *inter alia*:

- Defendant's reporting was pursuant to intentional policies and procedures;

- The FCRA was enacted in 1970; Defendant has had decades to become compliant;

- Defendant's conduct is inconsistent with the plain statutory language and all available guidance;

- Defendant has been sued numerous times for violating the FCRA but has yet to become compliant;

- Defendant knew or had reason to know that Defendant's conduct violated the FCRA.  Defendant received many complaints and disputes from consumers whose credit standing had been harmed but failed to correct its inaccurate reporting.

COMPLAINT

92. Defendant knowingly or recklessly behaved in a fashion that harmed consumers' credit.

93. In the alternative, Defendant's conduct was negligent under 15 U.S.C. § 1681o.

94. Plaintiff and the Class are entitled to recover actual or statutory damages, punitive damages, attorneys' fees, and costs.

## COUNT II
### VIOLATION OF THE CALIFORNIA
### CONSUMER CREDIT REPORTING AGENCIES ACT
### CAL. CIV. CODE § 1785.25

95. Plaintiff re-alleges and incorporates all preceding paragraphs.

96. Cal. Civ. Code §1785.25(a) provides, "a person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate."

97. Defendant knew that it was inaccurate to report that the Fingerhut Fetti accounts were opened when Plaintiff and Class members did not authorize the opening of the accounts.

98. At a minimum, Fingerhut should have reported the date opened for the Fingerhut Fetti as the date that Plaintiff's and Class members' Fingerhut Advantage accounts were opened.

99. Defendant's actions described above harmed consumers' credit, impairing consumers' ability to get credit, falsely portrayed consumers as opening a new account, and caused Plaintiff and Class members emotional distress.

100. Defendant's conduct was willful under and contrary to industry guidance. Defendant falsely represented that Plaintiff and thousands of other consumers had opened new credit accounts in April 2022.

101. Defendant knew that its actions would harm consumers' credit prospects and would result in false information being disseminated about consumers to third parties.

102. Defendant failed to reasonably reinvestigate its uniform credit reporting practices in light of Plaintiff's dispute.

COMPLAINT

103.    In addition to conduct set forth above in this complaint, Defendant's willful conduct is evidenced by, *inter alia*:

- Defendant's reporting was pursuant to intentional policies and procedures;

- The CCRAA was enacted in 1975; Defendant has had decades to become compliant;

- Defendant's conduct is inconsistent with the plain statutory language and all available guidance;

- Defendant has been sued numerous times for violating the CCRAA but has yet to become compliant;

- Defendant knew or had reason to know that Defendant's conduct violated the CCRAA. Defendant received many complaints and disputes from consumers whose credit standing had been harmed but failed to correct its inaccurate reporting.

104.    Defendant knowingly or recklessly behaved in a fashion that harmed consumers' credit.

105.    In the alternative, Defendant's conduct was negligent.

106.    Defendant's unlawful conduct is repeated and ongoing and will continue to harm Plaintiff and consumers in the future unless halted.

107.    Plaintiff and the Class have been harmed as a result of the above practices and seek all available relief Cal. Civ. Code § 1785.31 including actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

**COUNT III**
**VIOLATION OF THE UNFAIR COMPETITION LAW**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ*.**
**INJUNCTIVE RELIEF ONLY**
**BROUGHT IN THE ALTERNATIVE**

108.    Plaintiff re-alleges and incorporates all preceding paragraphs.

109.    Defendant's false advertising, inaccurate reporting and failure to reinvestigate constituted unlawful, unfair, and fraudulent business practices.

110.    Defendant's practices were unlawful because they violate the FCRA, CCRAA, and

16
COMPLAINT

Cal. and Bus. & Prof. Code § 17500.

111.    As described above, Defendant's practices violated the FCRA and CCRAA.

112.    Defendant also violated the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500.  That statute provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."  Cal. Bus. & Prof. Code § 17500.  It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*  As alleged in detail above, the advertising and practices of Defendant relating to marketing its credit accounts misled consumers acting reasonably under the circumstances that using Fingerhut's credit accounts would improve their credit standing.

113.    Defendant's practices were also unfair, because it is unethical, immoral, unscrupulous, oppressive, and substantially injurious to consumers to inaccurately report consumers' credit, to fail to reinvestigate disputes meaningfully, and to make false advertisements.

114.    Defendant's practices were fraudulent because its advertisements and statements were false, Defendant's credit reporting practices falsely portrayed that Plaintiff and Class members had opened an account that Plaintiff and Class Members had never agreed to open.

115.    The harm caused by these business practices vastly outweighs any legitimate utility they possible could have.

116.    Because Plaintiff and Class members will seek credit in the future, there is a real and immediate threat that Plaintiff will suffer the same injury with respect to future credit applications.

117.    Plaintiff lacks an adequate remedy at law to prevent the inaccurate reporting from recurring.

118.    Plaintiff and the members of the Class are therefore entitled to injunctive relief and

1  to the recovery of attorneys' fees and costs.

## **PRAYER FOR RELIEF**

3    WHEREFORE, Plaintiff, on behalf of herself and the Class, seeks the following relief:

4    a.    Determining that this action may proceed as a class action under Fed. R. Civ. P. 23;

5    b.    Designating Plaintiff as the class representative for the Class;

6    c.    Designating Plaintiff's Counsel as counsel for the Class;

7    d.    Issuing proper notice to the Class at Defendant's expense;

8    e.    Declaring that Defendants committed multiple, separate violations of the FCRA,

9  CCRAA and UCL;

10    f.    Declaring that Defendant acted negligently, willfully, and in deliberate or reckless

11  disregard of the rights of Plaintiff and the Class under the FCRA, CCRAA, and UCL;

12    g.    Awarding actual and/or statutory damages as provided by the FCRA and CCRAA;

13    h.    Awarding punitive damages;

14    i.    Granting appropriate injunctive relief under the UCL;

15    j.    Awarding reasonable attorneys' fees and costs and expenses, as provided by the

16  FCRA, CCRAA, the UCL, and/or under the substantial benefit and/or common fund doctrine or

17  other similar principle or doctrine, or in accordance with Cal. Code of Civ. Proc. §§ 1021.5;

18    k.    Granting such other and further relief, in law or equity, as this Court may deem

19  appropriate and just.

## **JURY DEMAND**

21    Plaintiff, on behalf of herself and the Class, demands a trial by jury on all issues triable by

22  a jury.

23

24  Dated: March 22, 2024                    BERGER MONTAGUE PC

25                                           /s/Julie Pollock

26                                           Julie Pollock, SBN 346081

27                                           *ATTORNEYS FOR PLAINTIFF*

28

COMPLAINT